J-S52013-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SUSAN A. PANICK | : | |
| | : | |
| Appellant | : | No. 1149 EDA 2019 |

Appeal from the Judgment of Sentence March 25, 2019
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0001361-2018

BEFORE: OTT, J., KUNSELMAN, J., and McLAUGHLIN, J.

MEMORANDUM BY OTT, J.: **FILED NOVEMBER 08, 2019**

Susan A. Panick appeals from judgment of sentence imposed March 25, 2019, in the Lehigh County Court of Common Pleas. The trial court sentenced Panick to a term of six months' intermediate punishment, with 30 days' house arrest on electronic monitoring, following her non-jury conviction of driving under the influence ("DUI") (controlled substances), careless driving, and moving stopped or parked vehicle.[1] On appeal, she argues the evidence was insufficient to sustain her convictions of DUI and careless driving, and the trial court demonstrated bias against her such that her due process rights were violated. For the reasons below, we affirm.

---

[1] **See** 75 Pa.C.S. §§ 3802(d)(2), 3714(a), and 3333, respectively.

The facts underlying Panick's conviction as presented during her non-jury trial were summarized by the trial court as follows:

[O]n December 25, 2017, at approximately 7:00 P.M., Constance Harding was in her family room located at 8033 Glenwood Court, New Tripoli, Lehigh County, Pennsylvania, when she observed a car backing up onto her back lawn. As it was dark and snowy outside, Ms. Harding was able to see the headlights from the vehicle streaming into her family room. Consequently, she and her husband went outside and found a vehicle stopped in their backyard. When they arrived on scene, another neighbor, Jason,[2] and his wife were already there. The neighbors had been driving home when they observed the subject vehicle backed up onto the Harding[s'] bushes and possibly stuck on the Harding[s'] lawn.

Mrs. Harding approached the vehicle and knocked on the window. The driver, later identified as the Defendant, Susan Panick, appeared to be confused, bewildered, and disoriented. [Panick] indicated that she was alright, but that she had Chinese food in the back seat for a party to which she was heading. Ms. Harding and the neighbor asked if [Panick] could place her vehicle in park. In response, [Panick] went in reverse and backed up further into a ditch. At this point, [Panick's] vehicle was approximately 30 [feet] into the Harding[s'] property, with the right tire in a ditch. Eventually [Panick] placed her vehicle in park. Ms. Harding helped [Panick] out of the vehicle, as she appeared to be unsteady. At that time, the neighbor was able to utilize tow ropes and remove the vehicle from the Harding[s'] lawn.

While the neighbor was towing the vehicle out of the ditch, Ms. Harding spoke with [Panick]. [Panick] related that she was on her way to a friend's house on George Road and that she was traveling from about five (5) minutes away. However, [Panick] stated that she was coming from Hellertown, which is more than thirty (30) minutes away. During the conversation, Ms. Harding noted that [Panick's] speech was slurred and she seemed to be confused. [Panick] requested that they do not involve the police. However,

_____

[2] Jason's last name is not provided in the notes of testimony.

Ms. Harding was concerned that [Panick] was not capable of driving her vehicle safely, so she called the police.

At 7:36 P.M. that evening, Trooper Ahmad Norman of the Pennsylvania State Police, Fogelsville Barrack, a drug recognition expert, arrived on scene in the area of George and Carpet Roads, New Tripoli, in full uniform and in a marked police vehicle for a single car collision. He observed a vehicle in the opposite lane of travel with its lights on, straddling the right fog line. After speaking with Ms. Harding and the neighbors, Trooper Norman approached the subject vehicle to speak with [Panick]. Upon his approach, Trooper Norman requested that [Panick] activate the emergency brake on the vehicle. Despite it being her vehicle, [Panick] was not able to readily locate the emergency brake to employ. During the conversation between Trooper Norman and [Panick], Trooper Norman found [Panick] to appear to be frantic, excited, disoriented, and incoherent at times. Also, Trooper Norman detected the odor of alcohol about the vehicle and her person. [Panick's] eyes were bloodshot and glassy, and [her] speech was slow. In addition, [Panick] constantly spoke over Trooper Norman, and her responses were not always responsive to the question posed.

Trooper Norman requested that [Panick] produce the appropriate documents, including the registration and insurance for the vehicle. [Panick] was fumbling through her paperwork and appeared to be confused. [Panick] explained that she was on her way to a party when she got lost. Her GPS had indicated that she had arrived at her destination, but there was no driveway. [Panick] expressed concern over missing the party and that the Chinese food was getting cold. Trooper Norman inquired if [Panick] had consumed alcohol earlier in the evening. [Panick] denied having drunk anything that day, but admitted that she took cough medicine as a sleep aid, anti-anxiety medicine, and pain medication earlier in the day. Trooper Norman noted there was an open bottle of prescription pills on the front seat. When questioned about same, [Panick] advised the Trooper that they were pain medication pills.

Trooper Norman requested that [Panick] exit the vehicle to perform field sobriety tests. Initially, [Panick] refused, but then she agreed and exited the vehicle. [Panick] did not perform well on the field sobriety test. She interrupted the Trooper numerous times, and would not follow the instructions. Consequently, the Trooper stopped the testing. Then, he asked if she would consent

to a PBT [breath] test. [Panick] consented, but had difficulty following the directions and blowing as instructed. Without completing the test, [Panick] walked away abruptly and sat in her vehicle. Ultimately [Panick] was able to comply with the instructions and she was positive for alcohol.[3]

Based on his training, experience, and observations of the scene, Trooper Norman believed that [Panick] was incapable of safe driving. When [Panick] was advised that she was being taken into custody for suspicion of Driving Under the Influence, [Panick] stated that she is "not going to jail," and clenched her hands around the steering wheel tightly in an effort to prevent her removal from the vehicle. [Panick] had to be forcibly removed from the vehicle. She was handcuffed, placed in the front seat of Trooper Norman's patrol vehicle, and transported to the Pennsylvania State Police Fogelsville Barracks for additional evaluation.

Upon arrival at the Fogelsville Barracks, the 12 step drug recognition process was initiated. Trooper Norman administered the Walk and Turn test in which [Panick] performed poorly. She displayed numerous cues of impairment, including missing a heal-to-toe step, stepping off the line, and turning abruptly instead of taking small steps. Similarly, [Panick] displayed many cues during the One Leg Stand test, including swaying, using her arms for balance, and legs/body tremors. These tests confirmed Trooper Norman's opinion that [Panick] was under the influence of a combination of controlled substances that rendered her incapable of safe driving.[6] Therefore, [Panick] was transported to the Lehigh County Central Booking Center for a legal blood draw. [Panick] consented to the same, and the blood was drawn at 10:55 P.M. The analysis of the blood drawn revealed the presence of the following drugs, within the therapeutic range: Amphetamine, Diphenhydramine, Clonazepam, 7-Aminoclonazepan, Trazodone, and Quetiapine.

--------

[6] Lisa Milinchuk, a certifying scientist at Health Network Laboratories and an expert in forensic chemistry, testified that the drugs present in [Panick's] system all have side

--------

[3] It merits mention that the subsequent blood draw revealed only controlled substances, and no alcohol, in Panick's blood. *See* N.T., 11/8/2018, at 57.

effects including drowsiness and dizziness. In addition, she opined that these drugs have an additive effect when used in combination with each other.

Trial Court Opinion, 5/20/2019, at 4-7 (record citations omitted).

Panick was charged with DUI – controlled substances, careless driving, moving stopped or parked vehicle, driving vehicle at safe speed, and operation of motor vehicle without required financial responsibility.[4] The case proceeded to a non-jury trial on November 8, 2018. The trial court found Panick guilty of the above-referenced three offenses, and not guilty of the other two summary violations. On December 30, 2018, the trial court granted trial counsel's petition to withdraw because Panick had retained new counsel for sentencing and appeal. Thereafter, on March 25, 2019, the court sentenced Panick to a term of six months' intermediate punishment, with thirty days' house arrest and electronic monitoring, for her DUI conviction. The other offenses resulted only in a fine. This timely appeal followed.[5]

_____

[4] **See** 75 Pa.C.S. §§ 3802(d)(3), 3714(a), 3333, 3361, and 1786(f), respectively.

[5] On April 17, 2019, the trial court ordered Panick to filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Defense counsel did not comply with that order. However, on May 29, 2019, counsel moved to file a concise statement *nunc pro tunc*, asserting he did not receive the court's April 17th notice. The court granted the motion on May 31, 2019, and directed counsel to file a concise statement within 10 days. Counsel complied with the directive and filed a concise statement on June 10, 2019.

In her first issue on appeal, Panick challenges the sufficiency of the evidence supporting her convictions of DUI and careless driving. Our review of a sufficiency claim is well-established:

> We [view] all the evidence admitted at trial in the light most favorable to the verdict winner, to determine whether there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. We may not weigh the evidence and substitute our judgment for the fact-finder ... [ ] [who] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Spotti*, 94 A.3d 367, 374 (Pa. Super. 2014) (*en banc*) (internal citations and punctuation omitted), *appeal dismissed as improvidently granted*, 132 A.3d 151 (Pa. 2016).

Panick was convicted of DUI under Subsection 3802(d)(2), which provides, in pertinent part:

> (d) Controlled substances.--An individual may not drive, operate or be in actual physical control of the movement of a vehicle under any of the following circumstances: …
>
> > (2) The individual is under the influence of a drug or combination of drugs to a degree which impairs the individual's ability to safely drive, operate or be in actual physical control of the movement of the vehicle.

75 Pa.C.S. § 3802(d)(2). Significantly, a prosecution under this subsection does not require expert testimony to determine the amount of drugs in the defendant's blood. *See Commonwealth v. Griffith*, 32 A.3d 1231, 1239 (Pa. 2011). Rather, similar to a general impairment conviction under Subsection 3802(a)(1), the focus is on the inability of the defendant to safely drive, operate, or be in actual physical control of a vehicle after taking

controlled substances (prescription or not), without consideration of the amount of substances detectable in a blood test. ***See id.*** Panick was also convicted of careless driving, which requires proof she drove "a vehicle in careless disregard for the safety of persons or property[.]" 75 Pa.C.S. § 3714(a).

Here, Panick argues the Commonwealth failed to prove she was unable to drive safely, and/or drove in careless disregard for the safety of persons or property. ***See*** Panick's Brief at 13-14. She insists the Commonwealth's case rested "largely on a subjective impression of a collection of traits attributable to [her] health problems and overall demeanor." ***Id.*** Panick explains:

> The fact that a person has bloodshot eyes does not necessarily establish intoxication; it also establishes a head cold, as Ms. Panick testified. The fact that a person cannot perform the physically demanding sobriety tests does not necessarily establish intoxication; it also establishes that Ms. Panick had a long, painful history of physical damage to her leg, hip, and back which prevented her from successfully completing those test[s]. Likewise, the fact that a person exhibits a slow and slurred speech pattern does not necessarily establish intoxication but could also simply be a physical trait. Evidence that Ms. Panick was difficult in that she did not follow instructions and talked over the trooper does not establish intoxication; as the Court observed, it only established a quirk of Ms. Panick's personality.

***Id.*** (record citation omitted). Indeed, Panick asserts the only evidence of her purported inability to drive safely was the fact that she "backed off a narrow, icy, unfamiliar road, on a dark night in an attempt to turn her vehicle around." ***Id.*** at 15. Furthermore, she insists that absent testimony to establish that her demeanor was "directly attributable to her prescription medications, there

is insufficient evidence to establish that she violated either Section 3802(d)(2) or Section 3714." ***Id.***

Our review of the record reveals sufficient evidence to support the trial court's verdict. With respect to the DUI conviction, there is no dispute Panick was under the influence of prescription drugs. Trooper Norman, a Drug Recognition Expert, testified that Panick advised him of the prescription medications she was taking to treat anxiety, depression, digestion issues, pain, and sleep issues, as well as over-the-counter cough syrup. ***See*** N.T., 11/8/2018, at 44. The trooper also observed a bottle of morphine pills on the passenger seat of her car. ***See id.*** Although Panick testified the only prescription drug she took on the day of the incident was Dexadrine to treat her attention deficit disorder,[6] Trooper Norman testified Panick told him she took Dexadrine, Tramadol, Neurontin, and cough syrup between 5:00 p.m. and 6:00 p.m. that evening, only an hour or two before the incident. ***See id.*** at 58. When asked if any of the medications would impair a person's ability to drive, Trooper Norman testified that everyone's tolerance level is different, but in combination the drugs would "definitely [have] … an additive effect." ***Id.*** at 45. The Commownealth's forensic chemistry expert, Lisa Milinchuk, testified Panick's blood test revealed therapeutic levels of amphetamine, Diphenhydramine, Clonazepam, 7-Amino Clonazepam, Trazodone and

_____

[6] ***See*** N.T., 11/8/2018, at 87.

Queitiapine in her system.[7]  **See** N.T., 11/8/2018, at 75.  Therefore, the Commonwealth presented sufficient evidence that Panick was under the influence of prescription narcotics.

However, the Commonwealth was still required to prove she was under the influence of controlled substances to such a degree that it impaired her ability "to safely drive, operate or be in actual physical control of the movement of a vehicle." 75 Pa.C.S. § 3802(d).  The testimony of both Harding and Trooper Norman provides ample evidence to support this finding.  First, Harding described Panick as "a little confused" and "kind of shaking" when she approached Panick's vehicle in her yard.  N.T., 11/8/2018, at 11.  Moreover, when Harding and her neighbor asked Panick to put her car in park so they could tow it out of the ditch, Panick drove in reverse, further into Harding's backyard.  **See id.**  Harding also testified that Panick did not seem to know how long she had been driving, stating she came from five minutes away, but the town where she lived was forty minutes away.  **See id.** at 13.  Lastly, Harding stated Panick implored them not to call the cops.  **See id.** at 16.

Trooper Norman, a trained Drug Recognition Expert, described Panick as frantic, "incoherent at times," and "very confused, disoriented." **Id.** at 35, 37.  He also noted her speech was slurred and she had bloodshot eyes.  **See**

---

[7] Milinchuk explained:  (a) amphetamine would typically be found in Adderall; (b) Diphenhydramine is typically found in Benadryl; (c) Clonazepam and 7-Amino Clonazepam are found in Valium or Xanax; and (d) Trazodone and Queitiapine are anti-depressants.  **See id.** at 76.

*id.* at 36. Trooper Norman testified that based on his training and experience, he believed Panick was "possibly ... under the influence of some sort of drug, alcohol or maybe a medical related incident." *Id.* at 37. She could not locate the emergency brake in her car when he asked her to apply it, and she fumbled through her paperwork when he requested to see her documentation. *See id.* at 36. At that point, Panick "mentioned that she didn't want to get a DUI." *Id.* Although the trooper detected an odor of alcohol on her breath, Panick insisted she did not have any alcoholic beverages that evening. *See id.* at 37. She did, however, provide him with a list of her prescription medications, and told him she took several of them between 5:00 and 6:00 p.m. *See id.* at 43-44, 58. Trooper Norman testified Panick refused to follow directions when he attempted to conduct the field sobriety tests on the scene, and displayed indications of impairment when she performed the tests at the barracks. *See id.* at 39, 46. Panick did not tell the trooper she had any medical issues that would compromise her ability to perform the tests. *See id.* at 46, 60. Trooper Norman concluded that, in his opinion, Panick was "incapable of operating the vehicle and she was, in fact, impaired by a drug or combination thereof rendering that." *Id.* at 67.

Although Panick provided alternative explanations for her behavior, the trial court, as fact-finder, clearly did not credit her testimony. *See Spotti*, *supra*. Moreover, she fails to acknowledge that the court also viewed the video recording from Trooper Norman's patrol car, and was, therefore, able to compare, first hand, Panick's behavior at the scene with the way she

presented herself in court. *See* N.T., 11/8/2018, at 50-52. We conclude the testimony of both Trooper Norman and Ms. Harding supports the trial court's determination that Panick was under the influence of controlled substances to such a degree that she was incapable of driving safely or being in actual physical control of her vehicle.

We note Panick provides very little argument concerning her careless driving conviction. *See* Panick's Brief at 13-14. "The *mens rea* requirement applicable to § 3714, careless disregard, implies less than willful or wanton conduct but more than ordinary negligence or the mere absence of care under the circumstances." *Commonwealth v. Ford*, 141 A.3d 547, 556 (Pa. Super. 2016), *appeal denied*, 164 A.3d 483 (Pa. 2016). In the present case, Panick's actions in backing over bushes[8] and into a ditch, 30 feet into Harding's yard, supports the court's determination that she drove in careless disregard for property. *See* 18 Pa.C.S. 3714(a). Accordingly, Panick's sufficiency challenge fails.

Next, Panick argues the trial court demonstrated bias against her such that her due process rights were violated, and she was denied the possibility of a fair trial. *See* Panick's Brief at 16. Panick contends the trial court did not keep an open mind about her innocence as demonsrated by the court's "repeated misstatements [of] the law; reliance on the improper, uninformed

_____

[8] Harding testified Panick "crushed" the bushes in her yard that line the ditch and sit about five feet off the road. N.T., 11/8/2018, at 26-27.

quasi-expert testimony of [an] unqualified layperson to establish a necessary element of several offenses; and a refusal to accept innocent explanations for allegedly criminal acts." Panick's Brief at 20. Specifically, Panick refers to (1) the court's comment that she is not supposed to drive if she has any controlled substances in her system;[9] (2) Trooper Norman's "completely uninformed, uneducated lay opinion as to the functions and side effects of Ms. Panick's medications;"[10] and (3) the court's dismissal "out of hand" of the innocent explanations for Panick's behavior based on her "medical issues and personal quirks."[11]

Preliminarily, however, we must determine if this issue is waived. Although Panick acknowledges trial counsel did not object to the court's comments, she insists "Pennsylvania's appellate waiver doctrine is not strictly applied to claims of judicial misconduct." Panick's Brief at 17. Citing to **Commonwealth v. Hammer**, 494 A.2d 1054 (Pa. 1985), Panick argues counsel is not required to make a timely objection when doing so would be futile in light of the judge's comments. **See** Panick's Brief at 17. We disagree.

First, we note **Hammer** was abrogated by **Commonwealth v. Grant**, 813 A.2d 726 (Pa. 2002). Panick maintains it was overruled on other grounds. However, we find procedurally, **Hammer** was on par with **Grant**. The

---

[9] **See** N.T., 11/8/2018, at 98.

[10] Panick's Brief at 23, *citing* N.T., 11/8/2018, at 44-45.

[11] **Id.** at 27, *citing* N.T., 11/8/2018, at 114.

*Hammer* Court overlooked trial counsel's failure to object to court bias and directly addressed the defendant's claims on direct appeal. In *Grant*, the Supreme Court specifically overruled *Hammer*, and held that, "as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review."[12] *Grant*, *supra*, 813 A.2d at 738. Therefore, Panick's judicial bias claim is waived on direct appeal. *See Commonwealth v. Colon*, 31 A.3d 309 (Pa. Super. 2011), *appeal denied*, 42 A.3d 1058 (Pa. 2012) (holding *Hammer* was overruled by *Grant*, and, therefore, defendant's challenge to trial court's purportedly improper and biased remarks to and questioning of defense witnesses was waived absent an objection at trial).

Nevertheless, we note even if we were to address Panick's issue, we would conclude she is entitled to no relief. Our review of the record from the non-jury trial reveals the trial court understood the law applicable to Panick's case and displayed no bias or ill will towards her.

Panick first cites to the court's discussion with her about the amount of prescribed medication in her blood test. *See* Panick's Brief at 21-22, *quoting* N.T., 11/8/2018, at 98-88. She insists the court "very clearly misunderstood

_____

[12] We note the facts of this case do not satisfy any of the exceptions to the general deferral rule set forth in *Grant*. *See Commonwealth v. Holmes*, 79 A.3d 562, 563-564 (Pa. 2013) (holding trial courts may address ineffectiveness claim on post-verdict motions and direct appeal when (1) the counsel's ineffectiveness is both apparent from the record and meritorious; or (2) there is good cause shown and defendant voluntarily waives his right to seek subsequent PCRA review); *Commonwealth v. Delgros*, 183 A.3d 352, 361 (Pa. 2018) (adopting third exception to *Grant* deferral rule when "the defendant is statutorily precluded from obtaining subsequent PCRA review").

and misstated the law" when it asserted "the mere presence of medication in [her] system was sufficient for a conviction for the DUI offense[.]" Panick's Brief at 22. However, Panick failed to cite to the next statement by the trial court, in which the court summarized:

> So if you're going to take something to go to sleep at night and it's still in your system, in combination with five other things, these people witnessed you **and said you're not capable of driving**.

N.T., 11/8/2018, at 99-100 (emphasis supplied). It is evident the court understood that to find Panick guilty of DUI under Subsection 3802(d)(2), it had to find there was some amount of controlled substances in her system, and those controlled substances affected her ability to drive safely. **See id.** at 106 (defense counsel states during closing "[i]t's not just having medication in your system but that the medication impairing your ability to safely drive a vehicle[,]" to which the court responds, "Yes").

Second, Panick contends the court improperly relied on "quasi-medical opinions offered by two unqualified witnesses." Panick's Brief at 23. This claim, however, does not demonstrate judicial bias, but rather, implicates the weight and sufficiency of the evidence supporting the verdict. In any event, Trooper Norman testified as a Drug Recognition Expert. **See** N.T., 11/8/2018, at 31. Therefore, he was qualified to describe the "functions and side effects of [] Panick's medications[.]" Panick's Brief at 23.

Third, Panick criticizes the trial court for exhibiting "a closed mind to realistic non-criminal explanations for Ms. Panick's physical disabilities,

- 14 -

anxious state, and manner of speech." Panick's Brief at 28. However, our review of the transcript reveals nothing more than the court's annoyance with Panick's sometimes disrespectful behavior. Panick's claim that the court failed to credit her defense implicates the weight of the evidence, rather than demonstrates judicial bias. Therefore, even if we were to address Panick's second issue, we would conclude she is entitled to no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/8/19